# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 25 2017, 8:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.W., J.W., D.B., Minor Children and Their Father, J.J.

J.J.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

October 25, 2017

Court of Appeals Case No.
49A02-1705-JT-1046

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Scott B. Stowers, Magistrate

Trial Court Cause No.
49D09-1601-JT-77, 49D09-1601-JT-78, 49D09-1601-JT-79

**Altice, Judge.**

## Case Summary

[1] J.J. (Father) appeals the termination of his parental rights to Jr.W. and Ja.W. (collectively, the Children). On appeal, Father argues that his due process rights were violated when the Department of Child Services (DCS) placed the children with a non-relative, rather than his mother (Paternal Grandmother). Father also argues that the trial court's termination order was not supported by sufficient evidence.

[2] We affirm.

## Facts & Procedural History

[3] R.W. (Mother) and Father have two children: Jr.W., born in 2006, and Ja.W., born in 2007. On March 10, 2014, DCS received a report that Mother had placed the Children and their half-sibling, D.B., at the Children's Bureau because she was homeless and that she had not returned for the Children and D.B. because she was subsequently arrested for assaulting her boyfriend.[1] On March 12, 2014, DCS filed a petition alleging the Children to be children in

---

[1] The trial court terminated Mother's parental rights to all three children and D.B.'s father's parental rights. Neither Mother nor D.B.'s father participates in this appeal. Our review concerns only the termination of Father's parental rights to the Children.

need of services (CHINS) because Mother was unable to care for them due to her incarceration and Father's whereabouts were unknown.

[4]     On May 8, 2014, the trial court adjudicated the Children as CHINS after Mother admitted the CHINS allegations and Father waived a factfinding hearing. That same day, the trial court entered a parental participation order that required Father to successfully complete the Father Engagement Program. At that time, the court ordered that Father have unsupervised visits with the Children. A Family Case Manager (FCM) was ordered to assess Father's home for possible placement of the Children. Following the assessment, the FCM did not recommend placement of the Children with Father due to his admitted drug use.[2]

[5]     Father had requested that the Children be placed with Paternal Grandmother. DCS considered placement with Paternal Grandmother "[o]ver quite a bit of time," but her "CPS history" and criminal history precluded her from being a placement option. *Transcript Vol. 2* at 171, 174. DCS applied for waivers on two occasions so that the Children could be placed in Paternal Grandmother's care, but both requests were denied. Although Paternal Grandmother indicated that she intended to ask the court to consider placement of the Children with

---

[2] Father's girlfriend, whose name was on the apartment lease, also admitted to drug use and refused to submit to a drug screen.

her, she did not follow through and make such request during the course of several hearings.

[6] Initially the Children and D.B. were placed in the same foster home. Ja.W. was eventually placed in a separate foster home because of her severe behavioral issues, including outbursts at home and school that were characterized by physical aggression, property destruction, and acting out with sexually charged behaviors. A behavioral consultant working with Ja.W. observed Ja.W. at her foster home throw things, break a bed frame, hit Jr.W. and D.B., and put her exposed breast up to Jr.W.'s mouth. Ja.W. later pulled down her pants exposing her buttocks and put her finger in her rectum in front of Jr.W. When informed of Ja.W.'s behaviors, Father tended to minimize the severity and would not consent to use of medications recommended by a physician. DCS invited Father to a team meeting to discuss the use of medication for Ja.W., but he did not attend. DCS thus sought and obtained a court order to provide Ja.W. with the recommended medication.

[7] At a subsequent team meeting that Father did attend, the importance of Ja.W. taking her psychotropic medication was discussed. Father, however, continued to adamantly express his disapproval of providing medication to Ja.W. The behavioral consultant noted that with treatment, including therapy and

medication, Ja.W. was making "a lot of progress in controlling her behavior."[3] *Id*. at 101.

[8]     In July 2014, the FCM requested suspension of Father's visitation with the Children because of Father's "anger outbursts" and threats to "whoop" the children in addition to his failure to report that Jr.W. was burnt by a lit cigarette. *Id*. at 16.  The trial court denied the request, but ordered that Father's visitation be supervised.  Also in July of 2014, Father pled guilty to battery resulting in bodily injury, which offense arose out of a domestic violence incident.  On August 14, 2014, the trial court modified its dispositional order to require Father to participate in additional services, including substance abuse and domestic violence assessments and follow all recommendations, and to submit to random drug screens.

[9]     Initially, Father participated in the Father Engagement Program, but then he "just stopped participating in those services." *Id*. at 58.  DCS made an additional referral for Father to participate in the Father Engagement Program, but he continued to have "minimal participation." *Id*.  Father also "refused" to complete the substance abuse assessment and never started the domestic violence assessment because he did not believe he needed those services. *Id*. at 18.

---

[3] There is some indication in the record that Ja.W.'s behavior did not significantly improve after she first started taking the medication, but that with adjustments to her medication and continued therapy, positive changes in her behavior were observed.

[10] Sometime between 2015 and 2016, DCS referred Father to participate in home-based therapy as an alternative to the Father Engagement Program. Father, however, refused to participate because he did not feel it was necessary. For approximately seven months between May 2015 and January 2016, Father did not participate in any services as ordered in the CHINS case.

[11] On July 31, 2015, Father was found to have violated probation after being arrested and charged with possession of marijuana, testing positive for marijuana, and failing to submit to drug screens. The court revoked Father's probation and ordered him to serve seventy days in the Marion County Jail. Father was subsequently convicted of possession of marijuana and, as a condition of his probation, he was required to submit to random drug screens. Father maintained that the probation department was supposed to submit the results of those drug screens to DCS. Just before Christmas 2015, DCS conducted a home visit and, on account of Father's demeanor and appearance during the visit, asked Father to submit to a drug screen, which he refused.

[12] On January 7, 2016, the trial court issued a permanency order finding that Father was not compliant with services and changing the permanency plan to adoption. On January 22, 2016, DCS filed a petition to terminate Father's parental rights. Around this same time, Father expressed an interest in again engaging in services. Father, however, indicated to DCS that he had complied with treatment for substance abuse and domestic violence through his probation, and thus, he was not willing to participate in such services a second

time through DCS. Father also claimed he had signed a release with probation authorizing disclosure of such information to DCS.

[13] Based on Father's representations, DCS worked to increase Father's visitation and move toward unsupervised visits. DCS ultimately recommended that the Children be placed with Father for a trial home visit, but the trial court would not permit the placement until Father provided documentation of his compliance with services. Father did not provide the requested documentation and DCS's attempts to acquire the information by directly contacting Father's probation officer and service providers were unsuccessful because, contrary to Father's claim, he never signed a release authorizing disclosure. About six months later, Father admitted to DCS that he had not participated in the required services through probation. Father also never provided the results of his drug screens through probation to DCS.

[14] During the time frame from January 2016 to June 2016, a court appointed special advocate (CASA) attempted four in-home visits with Father, who either cancelled or was incarcerated during each of the scheduled visits. The Children had also informed the CASA that Father instructed them not to talk to her or they would get their "ass whooped." *Id*. at 150.

[15] In May 2016, Father's unsupervised visitation with the Children stopped because of problems with the Children's behaviors upon their return, in addition to their complaints of being hungry. DCS sought to implement therapeutic visitation to address the Children's behaviors, but Father did not

begin this service because he was arrested in June 2016 for felony possession of marijuana. Starting in August or September, DCS no longer had contact with Father except for one occasion when he appeared at a hearing in September that concerned Ja.W.'s medication.

[16] On September 8, 2016, the CHINS court found Father was not participating in services and had refused to submit to drug screens since his most recent release from incarceration. The CHINS court ordered that the permanency plan remain adoption despite the request of the Guardian Ad Litem (GAL) that the plan be changed back to reunification.

[17] Jr.W. is in a foster/pre-adoptive home with D.B. and is doing well. When Jr.W. first entered foster care, he struggled in school and was at risk of retention. He has since improved in school and is now on the honor roll. Jr.W. has indicated his desire to be placed separately from Ja.W.

[18] After approximately nine different placements, Ja.W. is now in a pre-adoptive home where her behaviors are being addressed. Ja.W.'s pre-adoptive parents are "well versed in her behaviors and they are educated in how to deal with behaviors like this . . . through their own education." *Id.* at 119. Ja.W. has indicated that she is happy and wants to be adopted and "part of a family with a mom and dad." *Id.*

[19] By December 5, 2016, DCS had discharged Father from all services due to non-participation. DCS moved forward with the petition to terminate Father's parental rights. The court held an evidentiary hearing on the termination

petition on January 10, January 31, and February 7, 2017. The court issued its order, including findings of fact and conclusions of law, terminating Father's parental rights on April 18, 2017. Father now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

### Due Process

[20] Intertwined with his challenge to the court's determination of the best interests of the Children, Father argues that DCS's alleged failure to comply with Ind. Code § 31-34-4-2 and place the Children with Paternal Grandmother constituted a violation of his due process rights. Father's argument is misplaced and otherwise without merit.

[21] As pertinent here, I.C. § 31-34-4-2 requires DCS to consider placing a child determined to be a CHINS with a "suitable and willing relative . . . before considering any other out-of-home placement." We first note that I.C. § 31-34-4-2 is found in Article 34 of the Indiana Code, which is titled "Juvenile Law: Children in Need of Services" and applies to CHINS proceedings; it is therefore not relevant to a termination proceeding such as this. *See Hite v. Vanderburgh Cnty. Office of Family and Children*, 845 N.E.2d 175, 182 (Ind. Ct. App. 2006) ("CHINS proceedings are separate and distinct from involuntary termination proceedings because a CHINS cause of action does not necessarily lead to an involuntary termination cause of action"). We also note that Father did not raise this issue before the CHINS court and did not raise it below during the

termination proceedings. Because Father presents this argument for the first time on appeal, the argument is waived. *In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (finding that mother waived her due process claim because she raised it for the first time on appeal).

[22] Seemingly acknowledging his failure to challenge DCS's placement of the Children in the proceedings below, Father argues that DCS's alleged failure to comply with I.C. § 31-34-4-2 constitutes fundamental error. Citing *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*, Father maintains DCS's compliance with the kinship placement statute is a "prerequisite" to termination of his parental rights and that such compliance "would have negated the need for the filing of the termination of parental rights petition." *Appellant's Brief* at 28. Father's reliance on *D.D.*, however, is misplaced. In *D.D.*, the court addressed DCS's failure to comply with the termination statute that required DCS prove that the child had been removed from a parent for at least six months under a dispositional decree before termination of parental rights could occur. As noted above, the kinship placement statute applies to CHINS proceedings; it does not create a "prerequisite" to termination of parental rights. *Id*.

[23] Finally, Father asserts, without citation to authority, that DCS's failure to comply with the kinship placement statute "changed the entire course of this case" and "deprived Father of his right to due process." *Appellant's Brief* at 27. Father does not explain how generally claimed procedural irregularities amounted to a violation of his due process rights. "Bald assertions of error

unsupported by either cogent argument or citation to authority result in waiver of any error on review." *See Pasha v. State*, 524 N.E.2d 310, 314 (Ind. 1988).

[24] Notwithstanding the forgoing, Father's argument is without merit. Undermining his due process claim, the record indicates that DCS did in fact "consider" Paternal Grandmother for placement of the Children.[4] *See* I.C. § 31-34-4-2. In February 2015, DCS informed the court that it was examining the possibility of an adoption placement with Paternal Grandmother. Ultimately, the Children were not placed with Paternal Grandmother because her CPS and criminal history precluded such placement. DCS twice sought a waiver to permit such placement, but such requests were denied. Father has not established any error, let alone fundamental error, with regard to placement of the Children.

### Sufficiency

[25] Father argues that the evidence is insufficient to support the court's termination of his parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *D.D.*, 804 N.E.2d at 265. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment

---

[4] Paternal Grandmother acknowledged at the termination hearing that DCS considered her for placement of the Children.

terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[26]    The trial court entered findings in its order terminating parental rights. When the court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[27]    We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *K.S.*, 750 N.E.2d at 836. The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[28]     We first address Father's challenge to the court's Finding No. 13 in which the court noted that DCS sought suspension of Father's parenting time "following a number of incidents of physical discipline by [F]ather." *Appellant's Appendix* at 48. In the affidavit in support of its request to suspend Father's visitation, DCS referenced only one incident in which Father admitted that he spanked Ja.W. for misbehaving at school. DCS advised Father that physical discipline was not acceptable and Father and his girlfriend signed a safety plan in which they acknowledged such. DCS seemingly admits that the trial court's finding of "a number of incidents of physical discipline" was erroneous, noting that the record "does not indicate any other incidents of physical discipline" aside from the one identified in the affidavit. *Appellee's Brief* at 25. Considering the totality of the circumstances, this error is harmless.

[29]     Finding No. 13 aside, we turn to Father's challenge to the sufficiency of the evidence. Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the children and there is a satisfactory plan for the children's care and treatment. I.C. § 31-35-2-4(b)(2)(C), (D).

[30] Father challenges the trial court's conclusions as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in the Children's removal or continued placement outside Father's care will not be remedied and that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See* I.C. 31-35-2-4(b)(2)(B)(i), (ii). We focus our review on the requirements of subsection (b)(2)(B)(i).

[31] In determining whether the conditions that resulted in placement of a child outside the home will be remedied, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial

probability of future neglect or deprivation of the child. *Id.* In conducting this inquiry, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *L.S.*, 717 N.E.2d at 210.

[32] Father acknowledges that the conditions that led to continued placement of Children outside his care were his drug use, criminal activity (including domestic violence) and related incarceration, use of physical discipline, and failure to complete services. In an effort to reunify Father with the Children, Father was ordered to participate in the Father Engagement Program, substance abuse treatment, random drug screens, and services to address issues of domestic violence.

[33] The record reveals that Father only minimally participated in the Father Engagement Program and did not participate in alternative services offered by DCS due to his periodic incarceration.

[34] With regard to substance abuse, Father continued to use and possess marijuana throughout the CHINS case. Father was convicted of marijuana possession in August 2015 and pled guilty in yet another case in or about March 2017. Father discounts his marijuana use, asserting that he only "occasionally smoked marijuana" and that there was no evidence that he did so or was under the influence in front of the Children. *Appellant's Brief* at 19. We will not indulge Father's request to reweigh the evidence.

[35] DCS also had concerns about Father's unresolved anger issues. In July 2014, Father pled guilty to battery, which stemmed from a domestic violence incident that occurred within days after Father signed a safety plan with regard to the Children. Father minimizes the domestic violence incident, pointing to his self-serving statement that the single incident arose from an argument in which he threw his keys at his girlfriend. In contrast to Father's version of events, a DCS service provider reported that a visit to the home after the incident revealed that Father's girlfriend had a black eye and that Father was in jail on charges of battery, domestic battery, and strangulation. Father's version of events does not undermine the trial court's concern about Father's unresolved anger issues and the potential for physical violence as it concerns the Children. Indeed, DCS service providers and the Children observed Father have angry outbursts at other times. The Children reported that Father would threaten to "whoop" them if they talked to service providers. *Transcript Vol. 2* at 16. Father admitted to spanking Ja.W. for misbehavior at school and he threatened to spank the Children for other reasons.

[36] Throughout much of the CHINS case, Father indicated that he did not need services or he intentionally misled DCS by representing that he was participating or had completed services through probation. DCS relied on Father's representations to reunify the Children with him, even going so far as to request court authorization for a trial home visit. DCS sought documentary proof of Father's claimed compliance with services, but was unsuccessful. After six months of trying to obtain information confirming Father's representations, Father admitted to DCS that he had not participated in services through probation. Thereafter, Father did not participate in any services and by the time of the termination hearing, had not visited with the Children in over a year.

[37] Father's lack of cooperation, manipulation of service providers, and minimal participation in services substantially interfered with DCS furthering the goal of reunification. Father's history and actions throughout the CHINS case demonstrate that he is unwilling to improve his parental fitness and to assume full care of the Children. The court's determination that there is a reasonable probability that the conditions resulting in the continued placement of the Children outside the home will not be remedied is not clearly erroneous.

[38] Father also argues that the court's conclusion that termination was in the best interests of the Children is clearly erroneous. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013).

In so doing, the juvenile court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[39] Much of Father's argument in this regard is that the best interests of the Children would have been served by placement of the Children with Paternal Grandmother. Father asserts that "[s]uch placement would have allowed the family to remain intact" and that "DCS's efforts to seek termination of Father's parental rights would have been unnecessary." *Appellant's Brief* at 24. As noted above, DCS considered placement of the Children with Paternal Grandmother, but her CPS and criminal histories precluded such placement. DCS even went so far as to seek a waiver on two different occasions, but such requests were denied. We will not second-guess the determination that placement with Paternal Grandmother was not a suitable arrangement for the Children. Further, Father's assertions that termination would not have been necessary if the Children would have been placed with Paternal Grandmother from the outset or even that he might have consented to adoption of the Children by Paternal Grandmother are pure speculation.

[40] The court concluded that termination of the parent-child relationship is in the best interests of the Children because it "would allow them to be adopted into a stable and permanent home where their needs will be safely met." *Appellant's Appendix* at 50. The court found and the record supports that the Children have suffered trauma as a result of Father's drug use, criminal behavior, anger control issues, and removal from their home. The children are "very confused" about their circumstances and have remained out of their home for almost three years. *Trial Transcript Vol. 2* at 184. Father's failure to participate in and complete services and his continued drug use and criminal conduct has directly impacted the lack of consistency in the Children's lives.

[41] Of particular concern is that Ja.W. struggles with the trauma she has experienced. Ja.W. exhibits extreme behaviors both at home and at school. Father continues to minimize Ja.W.'s behaviors and disapproves of providing Ja.W. with medication that is helping control her behavior. Service providers expressed concern over Father's lack of insight into Ja.W.'s needs and his ability to handle her behaviors appropriately. Father's own anger issues only increased the concern about Father's ability to provide the necessary treatment for Ja.W.'s well-being and development.

[42] As this court long-ago stated and which continues to be true today, "children continue to grow up quickly; their physical, mental and emotional development cannot be put on hold while their recalcitrant parent fails to improve the conditions that led to their being harmed and that would harm them further." *Matter of D.T.*, 547 N.E.2d 278, 286 (Ind. Ct. App. 1989). The Children have

been separated from the home for over three years. The Children need permanency and stability that Father cannot provide and they have both expressed a desire to be adopted into the family in which they have been placed. Service providers also indicated their agreement with termination of Father's parental rights and adoption of the Children by their respective foster parents. DCS recommended termination because the CHINS case had been open for three years. The CASA opined that termination was in the Children's best interests because of their behavior after visits with Father and Father's threats to Children to maintain secrecy. The CASA further opined that Ja.W. was greatly in need of a stable environment and consistent care, which Father was unable to provide. Another service provider recommended termination because the Children, especially Ja.W. needed stability, structure, and permanency. Father was unable to provide a safe, healthy, and suitable environment for the Children and he remains unable to do so. The court's conclusion that termination is in the best interests of the Children is not clearly erroneous.

[43] In arguing that there is not a satisfactory plan for the Children's care and treatment, Father asserts that the plan of adoption that "would separate permanently these siblings cannot be in their best interest." *Appellant's Brief* at 25. Father maintains that the better choice for the Children is guardianship or adoption by Paternal Grandmother.

[44] Generally, adoption is a satisfactory plan. *In re S.L.H.S*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). Here, the plan is that the Children will be adopted by their respective foster parents. The record demonstrates that Jr.W. indicated a

desire to be placed separately from Ja.W. due to Ja.W.'s extreme behaviors, some of which were directed toward Jr.W. Ja.W. has been placed separately from Jr.W. in a home that is suitable and capable of handling her behavior issues. She is doing very well in her placement and making progress with controlling her behaviors. The Children have both expressed their desire to remain in their current placement. Service providers also expressed concern over the Children being placed together, noting the Jr.W. was a trigger for some of Ja.W.'s behaviors. Overall, the record supports the determination that the plan of adoption for the Children is a satisfactory plan for the future care and treatment of the Children.

[45] In sum, the court's termination of Father's parental rights to Children is supported by sufficient evidence.

[46] We affirm.

[47] Baker, J. and Bailey, J., concur.